9-1812, People v. Bill Clinton, Dixon. Council, for the proponent. Good morning, Your Honors. Rebecca Levy from the Office of the State Department Defender, arguing on behalf of Clinton Dixon. All right, Ms. Levy, I didn't tell prior counsel because I just forgot, but of course everybody knows 15 minutes for each side. Reserve any portion of those 15 minutes for rebuttal. We're familiar with the briefs. You can begin. I was planning on discussing both the first and second issues raised in this brief, time permitting, and I'd also like to reserve five minutes for rebuttal. During the first issue, Dixon alleged in his petition that alternate juror, Julio Saucedo, deliberated along with the 12 regular jurors. Ms. Levy, can I ask you to speak up a little louder? Yes. And that his attorney on direct appeal failed to argue that this denied him his right to a fair trial. And under People v. Hodges, it's at least arguable that appellate counsel's inaction fell below an objective standard of reasonableness. And it's at least arguable that Dixon was prejudiced by the failure to raise this issue. Could we talk about that juror? Is this case really the same as Babington? Because we have a juror whose name does not appear on the verdict form. True? In Babington, yes. No. Here, yes. Here. There's no question Mr. Saucedo's signature does not appear on the verdict. Right. And the record indicates that the clerk, that only 12 people were polled, and then was Mr. Saucedo the 13th polling? He was the 13th person polled. And the clerk stopped immediately through the sentence and did not finish asking whether this was your verdict. Was it now or is it whatever? The clerk, she stated, she said, was this your verdict and, and then at that point Mr. Saucedo answered. It's unclear if she stopped or if she was interrupted by him answering that yes, it was his verdict. Either way, he responded that it was his verdict. Does the record, though, because that she stopped indicate, number one, that he was just there? And the fact that he's not on the verdict at all indicate that this really isn't a Babington situation? I don't think so. I think in Babington there were 12 signatures. I thought there were, oh, the alternate signature was on the verdict form. In place of someone else's. Yes. In this case. And, of course, the only way, the only place the verdict form is signed is in the jury room. Yes, but if there's 12. Which means that that person was in the jury room. Right. If there are 12 lines on a verdict form, in order for Mr. Saucedo to have signed it, he would have had to add another line to sign his name. But when he answered the clerk's question that, is this your verdict, he responded yes. So I think his answer at least creates an arguable issue of fact that he was in the jury room and he deliberated. Well, if it does create an arguable issue of fact, why wasn't there anyone jumping up and down at that point? Well, in Babington. Were they all such, you know, were they all so derelict in their duty, the judge, the lawyers, that even the defendant was safe, not that he had any obligation of any kind, were all these other participants, you know, so negligent as to not even suggest something's wrong here? Well, I think in Babington, the court made clear that when the jury's polled, it happens quickly, and it's just in Babington that the court noted that the defendant, the state, and the judge, it's unreasonable of that to expect them to notice that that's happening, that the alternate had answered the polling at that moment. But in that case, though, we do have this alternate actually signing the verdict form. That's true, but I think the fact that only 12 jurors signed in Babington, and then his associate having to sign, he would have had to add an extra line to the form, so there wasn't space for him to sign. In Babington, there was, because another juror didn't sign, so there were 12 lines. He would have had to add his own line. Either way, he still responded that it was his verdict when the clerk asked him. Why would the clerk stop for this juror, this alternate, but hadn't done that with anyone else? Well, he was the 13th one asked, so I don't know that the clerk stopped, or if he interrupted her. We don't know that. All 12 people had been asked the exact same question immediately prior to him. He knew what the question was, and he answered it halfway through her asking it. So I think him affirmatively saying on the record that, yes, it's his verdict, tends to indicate that he was in the jury room. So that's an inference you want us to draw, because really there's nothing in the record that puts him in the jury room during deliberation. Well, we weren't in the jury room, so there's no way that we would know that he's there, but I think it's arguable that he was there, and that's all Dixon at this point. But it's an inference, right? And let me ask you, it is an inference. Let me go to this point. Let's say it goes to the second stage. How do you resolve, how would you, or let's say it goes to the third stage. How would this factual question get resolved? How would you anticipate it getting resolved? An evidentiary hearing at which. Of course, but who would testify at that evidentiary hearing? Any of the jurors could testify. So the jurors would have to testify. No, or counsel or the judge or. Well, once you raise counsel or the judge, then the question is, why didn't the defendant have an affidavit from counsel saying that he was seated at counsel table representing the defendant. He saw the alternate jurors. They were admonished directly by the trial judge and told that their services were no longer needed. Go back into the jury room, collect their stuff, and they came out. And he could say, yeah, I saw this alternate juror return to the jury room with the other, with the 12-person jury, and then I saw him come out. But nothing like that is ever introduced or never supported in the petition. It's not. Dixon alleged in his petition that his trial counsel was ineffective. Well, we know. He alleged that he was ineffective. So he's not, in that circumstance, he's not obligated to get, or it's unreasonable also to expect him to get an affidavit from counsel. Let's say you were at that evidentiary hearing and you get all 12, all 12, or even Mr. Salcedo, and they all say, can't remember, can't remember, can't remember, can't remember. What is this? Is this just like an exercise in making sure that, you know, only 12 persons signed the verdict? We know that. I think it would be unreasonable that they would all answer they can't remember. I mean, certainly they would know if he was in the jury room. He would know if he was there and deliberating. It's not something to question. When did the jury take place? What did you say? When did the jury take place? I can't recall, but I believe it was in 2006. I'm not sure. Can you overcome the prejudice prong? Well, the prejudice prong is that he deliberated and that he was there. Here's the other prejudice prong, because you're putting the fault on appellate counsel. And the fault is appellate counsel's failure to raise this issue on direct appeal. And I think Justice McBride just suggested that had it been raised on direct appeal, well, you have to show that but for counsel's mistake or failure to raise it, the issue would have been raised and the appellate court would have ruled on that issue. And I think Justice McBride brought out distinctions. And Babington would be the case that you'd rely on. And Justice McBride pointed out distinctions between this case and Babington. So what do you think would have happened had the issue been raised on direct appeal? Well, I would hope that it would either, since I believe this case is very close to Babington in that he did respond that he had deliberated, that he had verged with his, I would hope that it would have been reversed from the trial. But there are also federal cases, which I cited in my brief, and in some of those cases they said an alternate relief would have been on direct appeal to remand for a hearing to determine if the juror had actually deliberated. So that also could have been relief that would have been granted. And that certainly would have been timely, because the jury would have been far closer in time than it is now. All right. I can understand that. You wouldn't mind wrapping up? Go to the next issue. Okay. And then the second issue, obviously, is that Dickson, we believe he sufficiently alleged that his trial attorney was ineffective for failing to use a preemptory challenge. Why don't you just talk about Manning? Okay. Do you know the case of Manning? Yes, of course. Okay. Yeah. In Manning, obviously, the court recently held that prejudice is not presumed when counsel doesn't strike a biased juror. My position is that Manning is still distinguishable from this case. Okay. How is that? Well, for a few reasons. First, in Manning, despite the court's analysis of prejudice, it decided the case based on the first prompts, and said that there could have been some sort of trial strategy on the part of counsel for allowing that juror to remain. Here, we know that's not the case. Well, why do we know that's not the case? Well, counsel tried to have the juror struck for cause. The court denied it. He had two preemptories left, didn't try to use one. So we know that he wanted Ratliff off the jury, and it was unreasonable of him not to at least attempt to use a preemptory to have him struck. If anything, he was under the mistaken impression that he couldn't, and there was certainly no reason for him to save preemptories, because this is a 12-person, these were prospective jurors. It's not like he's going to have, he wants to save two in case bad jurors come up. Exactly. He already knew what 12 could look like. Right, and these were the last two jurors. Can't there be strategy with lawyers at this level when they may move for cause and then being unsuccessful strategize that they're not going to use a preemptory? I mean, how can you say that that couldn't be strategy at all? It can be in other cases, but not in this one. Well, why though? Because during the post-trial motion, the lawyer explained that the reason he didn't use a preemptory is because he thought he was precluded from doing so. So he believed that he couldn't, that the judge wouldn't let him. So we know that he wanted the juror up, but he didn't want Ratliff on the jury. There's no strategy involved. The record permanently shows that there's no strategy. Well, isn't there strategy in motions for new trial too, though? I mean, how can you say that this isn't part of the whole strategy? Well, I guess I'm sort of, the strategy in the motion for new trial is, the goal is to get a new trial. Yeah, and using any theory you can. It does seem a little odd that he would have a strategy to not exercise a preemptory, but have a strategy seeking to have the juror excused for cause. I mean, they seem irreconcilable. Not when you don't know what's coming up. But they were the last two picked. Yes, he did know. He knew exactly what the makeup of the jury was going to be. Right. So when, I guess I'm confused in that, during the motion for new trial, everyone agreed. So you're saying this was the last panel. Yes. In other words, was it done in 12? It was done in 12. And so everyone had already been, they were all in the box. There were not to be any other. There were 10 of them in the box. There were 10, not 12? Well, Ratliff and one other person were the last two that they were deciding over. The way that this judge did jury liberation is that one side picked 12, or they went through 12, one side had to agree to all 12, and then it went to the opposing side. And so when it went to the defense, he had struck, I believe, like two or three, used two or three preemptories against jurors that the were 12 sitting in the box. There were 10. And then Ratliff and one other juror made up 11 and 12. So there were 12. Yes. So eventually there were 12. But the state hadn't accepted those 12, had they? They had accepted 10 of them. Right. So now he, I'm not following. There were 12 in there. He says he wants to excuse one for cause, but the judge denies it. The state says, looks good for us, and that ends it. Well, no. Except for the alternate. What happened is that the defense had approved the 12, and the state questioned. They didn't approve it in the sense that, you know, he simply said. He accepted the 12. He accepted. Did he take 12? The defense did, yes. There were no alternates selected at that point? No. All right. So to say that he had given up everything and there was nothing left for any more selection is inaccurate because two alternates have to come up, and those peremptories can be used on them. You get additional peremptories for alternates, though. So he would have had two more for them as well. So he had two left. You get two or do you get one? I believe. One for each? I think you get one for each, so two more. So the defense took 11. Is that true? The defense approved all 12. Then it went to the state to question the remaining two. So we don't know whether the state's going to take those, but the judge supposedly had this backstriking rule. Is that it? Yes. Are you saying the state wouldn't have had an opportunity to strike? The state would have had an opportunity to strike the remaining two, not the ten that had been chosen before the state already approved. So had the state decided to strike the remaining two, then the lawyer is left with still needing peremptories, is he not? He is. All right. But I think it's clear based on the motion for a new trial that he didn't have a strategy to use those peremptories to save them because he had already believed that the judge wouldn't allow him to use a peremptory to strike them. Everyone agreed that, like the state, the judge. All right, you're going to have to wrap up. You'll have five minutes. The final way that I think this case is distinguishable from Manning is that Manning, in terms of prejudice, stated that the defendant must show that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. Since this is a first-stage PC, he's required only to show that it's arguable that it rendered the result of the trial unreliable or fundamentally unfair. And the case law is clear that an untruthful juror undermines the jury's verdict. Do we know this juror is untruthful? It's arguable that he is untruthful. It undermines the jury's verdict and renders it unworthy of confidence. So if that's the case, it's at least arguable that he was prejudiced and that it's at least arguable that the trial was unreliable based on an arguably dishonest juror being the foreperson of his juror. All right, thank you very much. We'll give you time for rebuttal. Good morning. Nancy Colletti, Assistant State's Attorney. I'm sorry, your last name? Colletti. Thank you. If I may address the second issue first, since we were just talking about that. Regarding counsel's last argument about his truthfulness, this Court on Direct Appeal commented that this juror's failure to mention his 20-plus-year-old arrests, which were not convictions, could have been just a memory lapse and that it did not reflect on his veracity. So I don't think it's even arguable that it could be shown that this juror prejudiced the outcome. Especially also, this Court found that the evidence of guilt was substantial in this case. To the extent that the veracity of anyone is judged by those before whom a person appeared before the Assistant State's Attorney trying the case, and he appeared before the defense attorney. And at least two of the three decided that his veracity was intact. They didn't say, we too question whether or not he's being truthful. Correct. And is that a factual conclusion that we can consider at this juncture for post-conviction proceedings? I think it is. And I also think that, you know, in a sense, this juror's possible bias could be deemed res judicata. This Court found on direct appeal that this juror's responses did not reflect on his veracity. Regarding the first issue, though, let's go back to that. And really, my concern is the application of the Hodges standard. And she, a defendant, asserts that it's an arguable, the factual question is arguably raised. And the standard in Hodges is, one, we should dismiss only those factual allegations that are fantastic or delusional. Now, I, for one, don't think that counsel, in her brief, is raising factual allegations that are either fantastic or delusional. Is that your argument before us, that they are allegations that you can characterize that way? Well, the language also in Hodges is that there's no arguable basis, either in law or fact. Is this Hodges' language or not? Fantastical or fantastic or delusional? But also that in an indisputably meritless view. So did the Supreme Court mean what it said? Yes, but the Supreme Court also discussed. Doesn't that tie our hands and shouldn't we remand this case for second stage? Not at all, because this claim is an indisputably meritless legal theory. There is nothing other than conjecture, speculation, that this juror deliberated with the jury. In fact, the record supports the opposite conclusion. It is beyond reason that a 13th juror would have gone into the jury room, deliberated with the jury, exited the jury room, not sign the verdict forms in the jury room, exited the room, and that that would have gotten past the notice of everybody in that room. Excuse me. Are you talking about this case or are you talking about Babington? Because it sounds to me like you're just talking about Babington, except for the alternate juror signing the verdict form. But that's exactly what happened in Babington. So why shouldn't we say if it happened in Babington, it can happen here? Because the signing of the verdict form is far different. But we're not talking about a legal conclusion that we're going to say this is exactly what happened, as in Babington. All we're saying is whether the allegation is one that is fantastic or delusional. I mean, can we really say that what they are asserting happened cannot have ever happened because it happened in Babington? But Babington was different. Well, I understand the outcome was different. There was proof that he was in the jury room. But it was also direct appeal. But all we're talking about, we're not talking about giving this guy relief. We're talking about whether or not he meets that minimum standard, that minimum, minimum, very minimum standard for sending back a PC. He didn't because there's nothing he has asserted. As you asked the opposing counsel, no affidavits. There's nothing from anyone, not even himself, saying that he saw this juror exit the jury room or that this juror participated. So that's what's missing is an affidavit. That's one of the many things that's missing. Also is any substantial, anything, any substance other than speculation that this alternate. Well, an affidavit is absolutely required, isn't it? Yes, it is. And there is no affidavit. No. But the record shows that this fellow was obviously in the courtroom. He was in the courtroom. And he said yes halfway through the question about was this. When the clerk stopped asking the question. Is this now your verdict? Right. I forget how it's phrased. Right. And there's also evidence, you know, it's in the record. The judge asked this alternate juror and the other alternate, the two alternates, before the jury ever started deliberating, please go to the jury room. That's exactly what happened in Baddington, too, though, isn't it? Except that in Baddington the juror was in the jury room. We know it. In this juror there is no substance. I thought that's the whole point of a PC first stage is to find out what we know and what we don't know. They're saying we don't know it. You're saying we do know it, but I'm not sure that I know either. What if he went in there but just didn't sign the verdict? Yeah. Is that sort of a suggestion that's here on the record? I don't think so, and I don't think speculation can support a conviction claim. Well, he obviously hung around. He was there. We know that. Don't we know that? We know he was in the courtroom after the verdict. Yes. Yes. We know he was in the courtroom at the time the verdict was delivered in open court. He was there. But we know also that there is no evidence that he deliberated with the jury, other than him interrupting the clerk, the clerk stopping midway in the sentence. And I think it's more arguable that the clerk realized that she shouldn't be calling his name. And when she stopped, he responded yes. They're just the trial court in this case properly dismissed at the first stage. Will you at least concede or will you acknowledge that, you know, it's somewhat of a close case, and to the extent that it's somewhat of a close case, maybe he shouldn't be assessed? This question was a close case? Your mere argument. Yes. I don't acknowledge that, Your Honor. All right. I think you can wrap it up. All right. Again, I would just like to address an issue, too, the argument quickly about strategy that you were asking opposing counsel about. I think it is arguable that it was a strategic decision for counsel not to exercise that peremptory challenge. It was, you know, immediate upon counsel hearing that this person did have, you know, two arrests, that he hadn't devolved to say, you know, I move for cause. When would he have exercised those two peremptories that he had left for the 12-person jury? When? Well, he could, and if I can just finish, it may not necessarily have been strategy to save his peremptories, but upon realizing who this person was and seeing that this person had already stated in voir dire that he had a son who was incarcerated for burglary, he may have thought, you know, I want this one. He had all that information before he moved for refusing for cause. But he may have reviewed it, and, you know, it may have been just knee-jerk, move for cause, because you hear that, you know, this potential juror had been arrested in the past. Are you asking us to speculate now as to the motive?  Is jury selection over before both sides accept the panels? No. Is it really at an end? No. All bets are off before both sides truly accept the panel? No, Your Honor. Is it on the record that this judge has this, I don't know how, backstrikes? It's not on the record. It was discussed allegedly in chambers before jury selection. So it's not on the record. But there's nothing on the record. No, Your Honor. So we don't really know that this judge even does that, do we? Correct. Well, there is something, we mentioned it in our decision on direct appeal, and we acknowledge that that may have been the case, but it wasn't an inflexible rule that the trial judge wouldn't have modified. In fact, he himself acknowledged, pretty much acknowledging that that is his rule, but he would have maybe given an exception. Didn't you say that? Didn't we say that in our decision? This Court said that in its decision, yes. But I don't believe the trial court did, Your Honor. All right. We would ask that you affirm the defendant's conviction, or affirm the trial court's dismissal, first-stage dismissal of the post-conviction petition. Thank you. All right. Thank you. Ms. Levy. Very briefly, I'll start with the second issue first, since she was just discussing it. It is absolutely on the record that the Court had this backtracking policy. I mean, the Court acknowledged that. Here's the end. Here's my last point on that. I think we know that had the person who eventually turned out to be the foreman been excused for cause or had been struck by the use of a preemptory challenge, we know who his replacement would have been. And we know, now know, his view of the evidence based on the polling that took place that shouldn't have took place. So you wonder, you wonder where is the prejudice? Well, we don't know that it would have been Tosito because there are two alternates. We don't know which one of them would have been. I thought he was the 13th. Well, he was the 13th who was polled. Well, they don't do it at random. They do it in order. They do 13, then they do number 14. Well, records generally reflect who's the first and the second alternate during the process of that jury selection. Right. I don't recall if he was the 13th or the 14th alternate selected, but I don't think the fact that he was polled 13th indicates, polled 13th after the verdict indicates that he was the 13th. He was just the 13th person polled after the regular names were read. The other alternate wasn't present, so his name wouldn't have been called if he had been 14th juror or if he had been the 13th juror, the alternate. All right. And also, as to the second argument. You'll have to keep it short. Okay, very briefly. As to the score, it did not affirmatively say that Ratliff's veracity was not in question. It said that it's debatable that it might not have been in question. We don't know if he lied or not. I think that the state's attorney believed that he did because he disclosed the arrest and stated that Ratliff wasn't truthful. So I think it is at least arguable that he was. Well, never mind. Go ahead. And in terms of the affidavits. Yeah, what about those? I don't think they were required here. Doesn't the Act refer to shall attach? Yes, but the Act also states that in situations where it's apparent from the record why someone couldn't obtain an affidavit, it's not required. What's in this record that suggests you couldn't obtain an affidavit? Well, as the court in Babington stated, it's unreasonable to expect anyone to notice that there is a 13th person. So it's unreasonable to notice that until you're reading the transcript and count them. Yeah, but in this case we have a 13th person agreeing to a verdict, so how would it not be easily noticed? It wasn't easily noticed in Babington. It's exactly the same situation. It happens quickly. The court didn't notice then either. Well, I thought in Babington there were 12 jurors. One of them just happened to be the alternate. It was unclear in Babington whether or not an alternate deliberated in place of a regular juror or if he deliberated in addition to a regular juror. But in that case, there's no doubt that that alternate signed the verdict and deliberated. He did, but the question is whether it's reasonable or not to expect people in the courtroom to notice that there is an extra juror at the time that jury is pulled. Well, in this case, there were 13 pulls as opposed to Babington. Babington didn't have 13 pulls, did it? Yes, it did. There were 13 people pulled in Babington. All right. We're asking, Your Honor, to remand for second-stage proceedings, and that if you do, that you also reverse the order imposing costs and fees for filing for elicitation. All right, well, thank you very much. The case will be taken under advisement.